No. 45,367

STATE OF KANSAS, *Appellee*, v. ROBERT LEO ROY, *Appellant*.

(455 P. 2d 512)

Opinion filed June 14, 1969.

*Robert J. Foster*, of Kansas City, argued the cause and was on the brief for the appellant.

*Frank D. Menghini*, County Attorney, argued the cause, and *Kent Frizzell*, Attorney General, and *Nick Tomasic*, Assistant County Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

HATCHER, C.: This appeal stems from a prosecution of defendant as principal in the second degree or accessory before the fact of the crime of manslaughter in the first degree.

The basic facts may be briefly stated. On the 5th day of August, 1965, the wife of the appellant gave birth to a boy child at the Kansas University Medical Center in Kansas City, Kansas. The birth was recorded as not unusual and the baby was released to its parents, the appellant and his wife, on August 10, 1965. When the child was released to its parents, the hospital records showed its condition as heathy and normal.

On or about the 20th day of August, 1965, the child was readmitted to the Kansas University Medical Center in what was described as a battered and beaten condition. It subsequently died of this condition on August 21, 1965.

The appellant was arrested after the doctors at the Kansas University Medical Center alerted the police. The defendant was charged with the crime of principal in the second degree or an accessory before the fact to manslaughter in the first degree.

The defendant was tried and convicted as charged. Hence this appeal.

Appellant first contends that the trial court erred in not discharging him because the state failed to prove venue.

The evidence clearly established the residence of the defendant as 2270 Russell Street, Kansas City, Kansas. The baby was at the residence of the appellant from August 10, to August 20, 1965, during which time the injuries were inflicted which resulted in its death. The baby was born and died in the Kansas University Medical Center, Kansas City, Kansas.

There is no merit in appellant's contention. In *State v. Fields*, 182 Kan. 180, 318 P. 2d 1018, we held:

> "It is not necessary to prove the jurisdictional facts of venue by specific question and answer that the offense occurred in the county. They may be established by other competent evidence in the record." (Syl. 4.)

This court will take judicial knowledge of the fact that the city of Kansas City and the Kansas University Medical Center are in Wyandotte County, Kansas. (K. S. A. 60-409 (*b*) (4), 60-412.) In *State v. Neil*, 203 Kan. 473, 454 P. 2d 136, we stated:

> "Although the record does not set out any direct evidence that the offenses were committed in Montgomery County, Kansas, the uncontradicted testimony shows they occurred in the city of Caney, Kansas. Under the provisions of K. S. A. 60-409 the trial court could take judicial notice that Caney is within the territorial boundaries of Montgomery County. Moreover, this court, under the provisions of K. S. A. 60-412, is empowered to take judicial notice thereof in this appeal." (p. 476.)

The appellant next argues that the evidence is insufficient to sustain the verdict.

It would perhaps be of assistance if we first considered the rules under which this court considers the sufficiency of the evidence.

In considering the sufficiency of evidence to sustain a conviction, this court looks only to the evidence in favor of the verdict, it does not weigh the evidence and if the essential elements of the charge are sustained by any competent evidence the conviction stands. In *State v. Dill*, 182 Kan. 174, 319 P. 2d 172, we stated at page 175 of the opinion:

> "We will examine the record to determine whether there is an entire absence of substantial evidence proving or tending to prove the essential elements of the crimes charged. If from all of the facts and circumstances disclosed by the evidence the jury might have reasonably drawn an inference of guilt, defendant's motion for discharge was then properly overruled and the verdict of guilty will not be disturbed. (*State v. Long*, 148 Kan. 47, 79 P. 2d 837; *State v. McCoy*, 160 Kan. 150, 160 P. 2d 238; *State v. Osburn*, 171 Kan.

330, 232 P. 2d 451; *State v. Haught,* 180 Kan. 96, 100, 299 P. 2d 573.) In *State v. Goetz,* 171 Kan. 703, 704, 237 P. 2d 246, we stated that if the evidence tended to disclose that the offense charged was committed and the defendant committed it, the question was for the jury to decide, even though the evidence was weak." (See, also, *State v. Townsend,* 201 Kan. 122, 439 P. 2d 70.)

We will search the record for the purpose of determining if, from the facts and circumstances, a reasonable inference of guilt could be drawn.

Carol Ann Reese, a pediatric resident at the Kansas University Medical Center, testified that when the baby was discharged to its parents on August 10, 1965, "at that time the child was healthy and normal." She described the baby when it was returned on August 20, 1965, as follows:

"Blue extremities and body. Mottled appearance. Pupils dilated. Skin had multiple second-degree burns on the buttocks and left leg. Not all on diaper area. Bruises and hematoma present over face, trunk and extremities. H. E. N. T., which means the head, ears, nose and throat, were negative. Fundi were negative. Chest—there were coarse rhonchi bilateraly. Heart—irregular rate. No bowel sounds. No masses. Penis—the tip of the meatus was burned. Catheter was inserted and no urine was obtained. Extremities, as I had noted, were quite cyanotic in the previous description. . . ."

Another resident physician testified from his notes, which read: "Probably this child has been beaten."

The doctor who performed the autopsy on the child stated:

"It is my further opinion that these traumatic lesions were inflicted upon the deceased by a person or persons unknown. . . ."

The mother of the child testified:

"Q. All right, now, let's go back prior to the 20th, the day you took it to the hospital, what, if anything, happened to cause this child to be taken to the hospital?

"A. Well, I fed it some sour milk and my husband started pushing on his stomach, and I told him to stop, and he got mad and he said, 'Get the God damn hell out of here,' and reached his hand to me.

"Q. What did you do?

"A. I moved. I got out of the way.

"Q. When did he push on its stomach? When was this, the 20th, the same day you took it to the hospital?

"A. No, it was the day before we took it to the hospital.

"Q. The day before, all right, and you had told him you had fed him sour milk?

"A. Yes, sir.

"Q. All right, when he was pushing on the stomach, how was he doing this?

"A. He was in a chair with arms on it.

"Q. The baby was?

"A. Yes, and he was leaning over it pushing with all his might on its stomach."

She further testified that the appellant refused to take the baby to the hospital when he came home from work but they did take it that night. The witness related a conversation between her and the appellant before entering the hospital:

"Q. All right, while you were there, did you have any conversation with your husband?

"A. Well, before we went there, I said something to him, I didn't know what to tell the people at the K. U. Medical Center, and so I told him—

"Q. Relate that conversation.

"A. I told him, I said, 'I don't know what to tell them but that I had a seizure.' He said, 'Go ahead and tell them that.' So, stupid me, I went ahead and told them I had a seizure.

"Q. Had you had a seizure?

"A. No, sir, I have not had a seizure on my baby, no, sir.

"Q. You told them this because you didn't know what else to say?

"A. No, sir, I didn't know what else to say. What would I have said with all the bruises and stuff all over his body?

"Q. Your husband agreed to have you say this?

"A. Yes, sir, he told me to go ahead, so I told them.

.    .    .    .    .    .    .    .    .    .    .    .

"Q. What conversation, if any, can you remember that your husband made or comment your husband made at the hospital?

"A. He said he hoped the little bastard died."

The appellant attempted to convince the jury that the baby was injured when he accidentally dropped it on the sofa, but the jury did not see fit to believe him. The nature of the injuries were hardly consistent with injuries resulting from such a fall. The question was for the trier of facts, not this court on appellate review.

The appellant in the court below and in his specifications of error contended—"That the court erred in not instructing on 4th degree manslaughter as requested by the defendant."

Appellant has changed his contention on appeal and now contends—"The court erred in failing to instruct the jury on manslaughter in the third degree."

We pass the procedural question raised by the change in position and consider the contention on its merit.

In *State v. McDermott*, 202 Kan. 399, 449 P. 2d 545, we disposed of this question and we do not propose to extend the discussion further.

In the *McDermott* case, while considering when an instruction should be given as to a lesser offense, we stated:

"Defendant contended the killing was in the heat of passion without design to effect death and requested an instruction on third degree manslaughter. The court refused to give the instruction.

"The instructions in a criminal case are to be confined to the issues in the case as determined by the charge in the information and the evidence adduced at the trial. Failure to instruct the jury on some lesser degree of the crime charged is not ground for reversal if the evidence at the trial excludes a theory of guilt on the lesser degree of the crime. In *State v. Linville*, 148 Kan. 142, 79 P. 2d 869, it was held reversible error to instruct on second degree manslaughter when the evidence adduced at the trial failed to establish such crime as charged in the information. In *State v. Hockett*, 172 Kan. 1, 238 P. 2d 539, the defendant was charged with robbery in the first degree and it was held the court was not required to instruct on any lesser degree of the crime when the trial evidence negated guilt of a lesser degree. Similar holdings in first degree murder cases may be found in *State v. Zimmer*, 198 Kan. 479, 426 P. 2d 267, cert. den. 389 U. S. 933, 19 L. Ed. 2d 286, 88 S. Ct. 298, and *State v. Hoy*, 199 Kan. 340, 430 P. 2d 275." (p. 401.)

Manslaughter in the third degree is defined by K. S. A. 21-413 as—

"The killing of another in the heat of passion, without design to effect death, by a dangerous weapon, . . ."

In the *McDermott* case we considered the term "heat of passion" in the following language:

"We must next determine the legal meaning and significance of the term 'heat of passion.' In 1 Wharton's Criminal Law and Procedure (Anderson) § 275 it is said:

" 'When the defendant seeks to reduce his offense from murder to manslaughter on the ground that he acted in hot blood upon circumstances constituting legal provocation, it is necessary that he show that he was in fact provoked by circumstances constituting legal provocation. If the defendant has voluntarily committed homicide without in fact having been provoked into a passion, he is guilty of murder.

" 'The passion aroused by the provocation must be so violent as to dethrone the reason of the accused for the time being; it must prevent thought and reflection, and the formation of a deliberate purpose. The theory of the law is that malice cannot exist at the same time as passion of this degree, and that the act of the defendant therefore cannot be considered the product of malice aforethought. Mere anger, in and of itself, is not sufficient, but must be of such a character as to prevent the individual from cool reflection and a control of his actions. . . .' (p. 583.)

"This court has said the term 'heat of passion' includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror. (*State v. Linville*, supra; *State v. Jones*, 185 Kan. 235, 341 P. 2d 1042.) However, in

order for a defendant to be entitled to a reduced charge because he acted in the heat of passion his emotional state of mind must exist at the time of the act and it must have arisen from circumstances constituting sufficient provocation." (p. 402.)

In the present case there is no evidence of any provocation stirring appellant to the heat of passion. The evidence would indicate that the injuries were inflicted over a period of time without any legal provocation or heat of passion.

A careful examination of the record discloses no error which would justify the granting of a motion for a new trial.

The judgment is affirmed.

APPROVED BY THE COURT.